Jerry RYAN, et al., Plaintiffs,

v.

**FLOWSERVE CORPORATION,**
et al., Defendants.

No. 3:03–CV–1769–B.

United States District Court,
N.D. Texas,
Dallas Division.

June 9, 2006.

Robert J. Hill, Claxton & Hill, Joe Kendall, Willie Briscoe, Provost Umphrey Law Firm, Marc R. Stanley, Martin Woodward, Roger L. Mandel, Stanley Mandel & Iola, Dallas, TX, Kimberly C. Epstein, Lauren M. Winston, Ex Kano S. Sams, II, Kimberly C. Epstein, Maria V. Morris, Mary K. Blasy, Shana E. Scarlett, Shawn A. Williams, Willow E. Radcliffe, Lerach Coughlin Stoia Geller Rudman & Robbins, San Francisco, CA, Tamara J. Driscoll, Lerach Coughlin Stoia Geller Rudman & Robbins, Seattle, WA, Thomas E. Bilek, Hoeffner & Bilek, Houston, TX, Mel E. Lifshitz, Bernstein Liebhart & Lifshitz, New York, NY, William B. Federman, Federman & Sherwood, Oklahoma City, OK, for Plaintiffs.

R. Thaddeus Behrens, Carrie Lee Huff, Nicholas Even, Haynes & Boone, Richard A. Rohan, Fletcher Yarbrough, Jennifer E. Morris, Todd A. Murray, Carrington Coleman Sloman & Blumenthal, David W. Klaudt, Charles Watts Flynn, Locke Liddell & Sapp, Ellen B. Sessions, Rodney Acker, Melissa J. Swindle, Jenkens & Gilchrist, M. Byron Wilder, Joshua P. Martin, Gibson Dunn & Crutcher, Rodney Acker, Melissa J. Swindle, Jenkens & Gilchrist, Dallas, TX, Dean J. Kitchens, Gibson Dunn & Crutcher, Los Angeles, CA, for Defendants.

*MEMORANDUM ORDER DENYING DEFENDANTS' MOTION FOR INTERLOCUTORY APPEAL UNDER § 1292(b)*

BOYLE, District Judge.

This is a securities fraud action. The Defendants move to appeal this Court's interlocutory order denying their motions to dismiss Plaintiffs' Fifth Amended Complaint. The precise motion before the Court is Defendants' Motion to Certify November 22, 2005 Order for § 1292(b) Interlocutory Appeal (doc. 141). For the reasons that follow, the motion is DENIED.

## I.

## BACKGROUND

Defendant Flowserve Corporation,[1] is a world-wide manufacturer of pumps, valves, seals and related components in the "process industries." Plaintiffs, individuals who purchased publicly traded securities of Flowserve during the purported class period, allege that the Defendants violated federal securities laws by overstating the company's income and understating its costs in order to conceal its declining financial condition. As a result, Plaintiffs claim they suffered losses when the company's true financial condition was revealed in mid–2002 and the stock price plummeted "75% from its Class Period high." (Fifth Am. Compl. ¶¶ 13, 328–49)

Plaintiffs filed this suit in August 2003 accompanied by a series of pleadings culminating in their 154–page Fifth Amended Complaint. Flowserve responded with motions to dismiss pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities

---

1. Along with Flowserve Corporation, Plaintiffs have sued certain officers, auditors and underwriters for the company. For purposes of this order, the Defendants will be collectively referred to as "Defendants" or "Flowserve."

Litigation Reform Act of 1995 ("PSLRA"). In their motions, the Defendants identified numerous perceived pleading deficiencies including—and relevant to this determination—that Plaintiffs failed to adequately plead loss causation; that Plaintiffs' claims are barred by the statutory negative causation defense; and that Plaintiffs' claims regarding Defendants' earnings projections statements are precluded by the PSLRA's "safe harbor" provision.

On November 18, 2005, the Court heard arguments on the Defendants' motions to dismiss and denied all three motions in a ruling from the bench followed by a written order on November 22, 2005. Defendants now seek certification on three issues they describe as "controlling questions of law", including:

- Whether, in a case predicated on the fraud-on-the market theory, a plaintiff must plead that the alleged curative disclosure of the "truth" that resulted in the plaintiff's losses revealed each material fact allegedly misrepresented to satisfy the required element of loss causation;

- Whether, in a case predicated on the fraud-on-the market theory, a plaintiff's claims under Section 11 are barred by the statutory negative causation defense where the alleged curative disclosure that the plaintiff claims resulted in his losses did not reveal the facts allegedly misrepresented in the challenged registration statements; and

- Whether the PSLRA safe harbor for forward-looking statements protects from liability projections accompanied by meaningful cautionary language independent of the speaker's alleged state of mind.

(Defs. Mot. to Certify ("Mot.") at 2)

Plaintiffs oppose the motion on several grounds, arguing, *inter alia,* that the Defendants' "controlling questions" are simply fact-bound issues disguised as questions of law for § 1292(b) purposes; that an interlocutory appeal will "retard" rather than advance the litigation; and that they will be severely prejudiced by any further postponement of discovery in this almost three-year-old case.

## II.

### § 1292(b)

At the outset, it is important to understand the circumstances under which a party may appeal an interlocutory order. This is best approached by first reviewing the pertinent statutory language and then examining how the courts have interpreted and applied the provision. Section 1292(b) expressly permits a district court to certify an order for interlocutory appeal only if it "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C.A. § 1292(b) (1994 & Supp.2005). This terminology was intended to restrict the category of cases suitable for permissive appeal, but courts have not always agreed on the contours of the stated limitations. *See* 16 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3929 at 366–67 (2d ed.1996) [hereinafter WRIGHT & MILLER]. *See generally Ahrenholz v. Bd. of Trustees of the Univ. of Illinois,* 219 F.3d 674, 676 (7th Cir.2000) ("The [§ 1292(b)] criteria, unfortunately, are not as crystalline as they might be . . . .").

For example, at times, courts including the Fifth Circuit have held that § 1292(b) appeals are appropriate under only "exceptional" circumstances or in "big" cases. *Clark–Dietz and Associates-Engineers v. Basic Constr. Co.,* 702 F.2d 67, 69 (5th Cir.1983) (explaining that interlocutory appeals are permitted only under "exception-

al" circumstances); *see Gottesman v. Gen. Motors Corp.,* 268 F.2d 194, 196 (2d Cir. 1959) (clarifying that certification should be "strictly limited to the precise conditions stated in the law"); WRIGHT & MILLER, *supra,* § 3929 at 365 & n. 10 (internal citations omitted) (collecting cases holding interlocutory appeal appropriate only in "big" or "exceptional" cases).

Conversely, at other times courts—the Fifth Circuit included—have employed a more flexible approach to § 1292(b) appeals. In *Hadjipateras v. Pacifica, S.A.,* Judge Brown promoted a more relaxed application of the provision:

> Each application is to be looked at ... in the light of the underlying purpose reflected in the statute.... [I]t was a judge-sought, judge-made, judge-sponsored enactment. Federal Judges from their prior professional practice, and more so from experience gained in the adjudication of today's complex litigation, were acutely aware of two principal things. First, certainty and dispatch in the completion of judicial business makes piecemeal appeal as permitted in some states undesirable. But second, there are occasions which defy precise delineation or description in which as a practical matter orderly administration is frustrated by the necessity of a waste of precious judicial time while the case grinds through to a final judgment as the sole medium through which to test the correctness of some isolated identifiable point of fact, of law, of substance or procedure, upon which in a realistic way the whole case or defense will turn. The amendment was to give to the appellate machinery of § 1291 through § 1294 a considerable flexibility operating under the immediate, sole and broad control of Judges so that within reasonable limits disadvantages of piecemeal and final judgment appeals might both be avoided. It is that general approach rather than the use of handy modifiers—

which may turn out to be Shibboleths—that should guide us in its application and in determining whether the procedure specified has been substantially satisfied.

290 F.2d 697, 702–03 (5th Cir.1961)); *see also* WRIGHT & MILLER, *supra,* § 3929 at 368–69 & n. 16 (quoting *Ex parte Tokio Marine & Fire Ins. Co.,* 322 F.2d 113, 115 (5th Cir.1963)) (criticizing other courts' "epithets" that § 1292(b) is to be " 'sparingly applied' ").

 Regardless of the approach—rigid or more flexible—some common ground can be gleaned from both ends of the spectrum. First, the decision to permit such an appeal is firmly within the district court's discretion. *Cheney v. U.S. Dist. Court for Dist. of Columbia,* 542 U.S. 367, 405 n. 9, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (Ginsburg, J., dissenting) (instructing that discretion for a § 1292(b) appeal lies "in the first instance in the district court's sound discretion"). Second, § 1292(b) is not a vehicle to question the correctness of a district court's ruling or to obtain a second, more favorable opinion. *McFarlin v. Conseco Serv., LLC,* 381 F.3d 1251, 1256 (11th Cir.2004) (quoting S.Rep. No. 85–2434 (1958), reprinted in U.S.C.C.A.N. at 5260–61)). Third, the issue for appeal must involve a question of *law*—not fact. *Clark–Dietz,* 702 F.2d at 69 (holding that "fact-review" issues are inappropriate for § 1292 review). And a "question of law" does *not* mean the application of settled law to disputed facts. *McFarlin,* 381 F.3d at 1258 (*citing Ahrenholz,* 219 F.3d at 676). Thus, resolving the issue presented should not require the appeals court to go "hunting through the record" to see whether "a genuine issue of material fact may be lurking there." *Ahrenholz,* 219 F.3d at 676.

 Fourth, the issue for appeal must involve a *controlling* question of law.

Whether an issue of law is *controlling* generally hinges upon its potential to have some impact on the course of the litigation. At one end of the continuum, courts have found issues to be controlling "if reversal of the district court's opinion would result in dismissal of the action." *Strougo v. Scudder, Stevens & Clark, Inc.*, No. 96 CIV. 2136(RWS), 1997 WL 473566, at *7 (S.D.N.Y. Aug.18, 1997) (citing *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir.1990)) (other citations omitted). An issue of law has also been termed controlling where "the certified issue has precedential value for a large number of cases." *Id.* On the other hand, an issue is not seen as controlling if its resolution on appeal "would have little or no effect on subsequent proceedings." John C. Nagel, Note, *Replacing the Crazy Quilt of Interlocutory Appeals Jurisprudence with Discretionary Review*, 44 DUKE L.J. 200, 212 (1994); 16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, *supra*, § 3930 at 424. Between the extremes, courts have found the issue of whether an interlocutory appeal involves a controlling question of law to be "closely tied" to the requirement that the appeal will materially advance the ultimate termination of the litigation. WRIGHT & MILLER, *supra*, § 3930 at 432; *see also* Nagel, *supra*, at 212 (courts have turned to the "materially advance" prong of § 1292(b) in deciding whether an issue of law is controlling) (internal citations omitted). In sum, a *controlling* question of law—although not consistently defined—at the very least means a question of law the resolution of which could materially advance the ultimate termination of the litigation—thereby saving time and expense for the court and the litigants. WRIGHT & MILLER, *supra*, § 3930 at 426 & n. 25 (2d ed. 1996 & Supp.2005)(citing *S.E.C. v. Credit Bancorp, Ltd.*, 103 F.Supp.2d 223, 227 (S.D.N.Y. 2000)).

A fifth and key concern consistently underlying § 1292(b) decisions is whether permitting an interlocutory appeal will "speed up the litigation." *Ahrenholz*, 219 F.3d at 676. "The institutional efficiency of the federal court system is among the chief concerns motivating § 1292(b)." *Strougo*, 1997 WL 473566, at *6 (citing *Forsyth v. Kleindienst*, 599 F.2d 1203 (3d Cir.1979)). Stated another way, § 1292(b) is designed to minimize burdens "by accelerating or ... simplifying trial court proceedings." WRIGHT & MILLER, *supra*, § 3930 at 439.

Finally, there must be substantial ground for difference of opinion over the controlling question of law for certification under § 1292(b). This factor has been described as the least troubling for district courts. WRIGHT & MILLER, *supra*, § 3930 at 419–20 (district courts "have not been bashful about refusing to find substantial reason to question a ruling of law"). Nonetheless, of all the § 1292(b) criteria, this one is possibly the least predictable in application. Perhaps, as one commentary on § 1292(b) recognized over thirty years ago, this is because "[d]egrees of legal doubt escape precise quantification." Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 88 HARV. L.REV. 607, 623 (1975). That same commentary proposed a standard "that would require a trial court to believe that a reasonable appellate judge could vote for reversal of the challenged order" before the disagreement would be considered substantial under § 1292(b). *Id.* Consistent with this line of thought, courts have found substantial ground for difference of opinion where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of

the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented. 4 Am.Jur.2d *Appellate Review* § 128 (2005). But simply because a court is the first to rule on a question or counsel disagrees on applicable precedent does not qualify the issue as one over which there is substantial disagreement. *Id.* Nor does a party's claim that a district court has ruled incorrectly demonstrate a substantial disagreement. *Wausau Bus. Ins. Co. v. Turner Constr. Co.*, 151 F.Supp.2d 488, 491 (S.D.N.Y.2001). In the end, "substantial" means just that—significantly great. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1174 (10th ed.1998).

## III.

## ANALYSIS

### A. Loss Causation Pleading

With the foregoing court opinions and commentary as a guide, the Court turns its attention to the merits of Flowserve's motion to certify to determine whether it has met the prerequisites for a § 1292(b) appeal. Flowserve's first "controlling question" relates to loss causation pleading and reads:

> Whether, in a case predicated on the fraud-on-the market theory, a plaintiff must plead that the alleged curative disclosure of the "truth" that resulted in the plaintiff's losses revealed each material fact allegedly misrepresented to satisfy the required element of loss causation.

Flowserve's contention that this issue is appropriate for a § 1292(b) appeal derives primarily from its interpretation of the Supreme Court's opinion regarding loss causation in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In *Dura,* the Supreme Court tightened the loss causation pleading standards in fraud-on-the-market

cases by doing away with the "inflated purchase price" method of pleading loss causation and holding that loss causation could no longer be established solely by alleging an artificially inflated purchase price followed by a drop in stock price. Analyzing whether Flowserve has met its burden of demonstrating that its first "controlling question" meets the standards for a § 1292(b) appeal necessarily begins with a review of the *Dura* case.

*Dura* was a securities fraud class action which resolved a circuit split by dealing head-on with the "artificially inflated purchase price" method of pleading loss causation. The plaintiffs, who bought stock in a pharmaceutical company, alleged that the company made false statements about anticipated FDA approval of a new asthmatic spray device which in turn artificially inflated the company's stock price. When the company later announced lower than expected earnings, the stock price dropped significantly. Plaintiff—in pleadings subsequently endorsed by the Ninth Circuit—alleged loss causation as follows: "'In reliance on the integrity of the market, [the plaintiffs] ... paid artificially inflated prices for Dura securities' and ... suffered 'damage[s] thereby....'" *Id.* at 340, 125 S.Ct. 1627 (internal citations omitted).

The narrow issue before the *Dura* Court was whether a plaintiff could satisfy the loss causation pleading and proof requirement "simply by alleging in the complaint and subsequently establishing that 'the price' of the security *on the date of purchase* was inflated because of the misrepresentation.'" *Id.* at 338, 125 S.Ct. 1627 (emphasis in original). The Supreme Court found the answer to that question to be an unequivocal "no."

The Court began its opinion by identifying the basic elements of a securities fraud action—including the indispensable re-

quirement that plaintiffs prove "a causal connection between the material misrepresentation and the loss." *Id.* at 342, 125 S.Ct. 1627. Taking issue with the Ninth Circuit's approval of the plaintiffs' pleadings, the Court stated: "[n]ormally, [in fraud-on-the-market cases,] an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Id.* Reviewing the "tangle of factors affecting [stock] price", the Court concluded that the causal connection between an inflated purchase price and subsequent shareholder economic losses was tenuous at best. *Id.* at 343, 125 S.Ct. 1627 ("the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss"). The opinion directed that plaintiffs in securities fraud cases must prove that the defendant's fraudulent conduct "proximately caused [their] economic loss" and determined that the " 'inflated purchase price approach' "—standing alone—was not up to the task. *Id.* at 344–46, 125 S.Ct. 1627.

Addressing separately the *pleading* requirements for loss causation, the *Dura* Court made clear that plaintiffs could no longer rely solely on allegations of an "artificially inflated purchase price" to demonstrate the essential elements of proximate causation and economic loss. While the Court found the *Dura* plaintiffs' loss causation pleadings inadequate, it did not at the same time adopt more onerous pleading standards for such allegations. Rather, the Court clarified that Federal Rule of Civil Procedure 8(a)(2)'s "short and plain statement" rule would continue to govern

loss causation pleadings. *Id.* at 346, 125 S.Ct. 1627. So long as the allegations provide the defendant with fair notice of the plaintiff's claims and its grounds, the Court counseled, the pleadings will pass muster. *Id.* This means that "a plaintiff who has suffered an economic loss [must] provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347, 125 S.Ct. 1627.

In sum, *Dura* eliminated the "artificially inflated purchase price" method of proving loss causation, reemphasized the importance of demonstrating proximate cause and economic loss and renewed Rule 8(a)(2)'s "short and plain statement" rule for such pleadings. Whether *Dura* heralded the change in loss causation pleading standards urged by Flowserve is another matter.

Before moving to that issue, it bears mention that in various places in its briefing, Flowserve frames the loss causation "controlling question" for § 1292(b) purposes in more general terms than in the introduction to its briefing.[2] To be clear, Flowserve's bottom line here is that post-*Dura*, loss causation must be pled in an almost formulaic manner requiring the plaintiff to plead that the "alleged curative disclosure of the 'truth' that resulted in the plaintiff's losses revealed each material fact allegedly misrepresented [or omitted] to satisfy the required element of loss causation"—a method this Court will refer to as "fact-for-fact" pleading.

---

**2.** For example, Flowserve variously frames the "controlling legal issue" for § 1292(b) as "what must be alleged to satisfy the loss causation requirements set forth by *Dura,* the PSLRA and Fifth Circuit precedent" (Mot. at 5); "whether the Complaint's allegations, taken as true: ... state a legally viable loss causation theory under the Supreme Court's

decision in Dura" (Reply at 1); and "there is a substantial ground for a difference of opinion regarding whether Plaintiff's loss causation theory is legally valid." (Reply at 3). But it is clear from the entirety of its briefing that Flowserve rests its argument on the premise that *Dura* requires "fact-for-fact" pleading of loss causation.

### 1. Controlling Question of Law

■ Plaintiffs first challenge Flowserve's motion to certify the loss causation issue as raising "fact-bound" pleading issues as opposed to legal questions. Interlocutory appeals have been allowed on pleading issues which raise difficult questions of substantive law but not when the issue raised is a "mere matter of properly pleading a claim sought to be brought within a recognized and generally sufficient legal theory." 16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD C. COOPER, *supra*, § 3931 at 453, 458–59 (A motion to dismiss a complaint "may rest . . . on resolution of a clearly determinative question of law . . . or . . . on questions merely of pleading etiquette.").

Here, the Court is satisfied that Flowserve has raised an issue of law as opposed to fact regarding the requisite pleading standards for loss causation post-*Dura*. As articulated in its "controlling question 1" and accompanying argument, Flowserve contends that *Dura* requires Plaintiffs to demonstrate "a direct causal link between the misstatement and . . . [their] economic loss." (Mot. at 5–6) The "direct causal link", according to Defendants, cannot be established "with respect to an alleged misrepresentation unless and until there is a revelation of the truth concerning *that* misrepresentation followed by a stock price decline." (Mot. at 5) (emphasis in original) The Court finds that this adequately raises a legal question as to the post-*Dura* minimum requirements for pleading a "legally viable loss causation theory." (Reply at 1) Whether it is a *controlling* question of law is another matter. Rather than decide that issue, the Court will assume without deciding that it is a controlling question and move to the "substantial disagreement" requirement where it clearly falls short.

### 2. Substantial Ground for Difference of Opinion

■ In determining whether a substantial ground for difference of opinion exists in the context of § 1292(b), the obvious first task is to identify the opinion at issue and then weigh the degree of disagreement. In other words, first and foremost, there must be a discernable *opinion* triggering the requisite disagreement. Drawn from its interpretation of *Dura*, Flowserve identifies the opinion at issue as:

> Whether, in a case predicated on the fraud-on-the market theory, a plaintiff must plead that the alleged curative disclosure of the "truth" that resulted in the plaintiff's losses revealed each material fact allegedly misrepresented to satisfy the required element of loss causation.

Implicit in this question and expressed throughout its briefing is Flowserve's assumption that the *Dura* opinion signaled a change in loss causation pleading requirements beyond its narrow holding on the inflated purchase price theory. More to the point, from *Dura* and from certain Fifth Circuit cases dealing with proximate cause in other securities fraud contexts, Flowserve extracts "a substantial likelihood" that the Fifth Circuit will interpret *Dura* to impose a type of "fact-for-fact" loss causation pleading requirement. Taking it a step further, Flowserve submits that, post-*Dura*, the Fifth Circuit can reasonably be expected to hold that loss causation in fraud-on-the-market cases can only be shown by demonstrating that *each* fact allegedly misrepresented (the fraud) was also later revealed to the market triggering the drop in stock price. (Mot. at 7) Applied to this case, Flowserve's fact-for-fact pleading requirement would require Plaintiffs to allege that the precise topics of the alleged misrepresentations—Flow-

serve's historical financial statements, statements of debt covenant compliance and statements regarding the IDP and IFC acquisitions—were later *one-by-one* revised and revealed to the market in truthful terms.

■ The obvious shortcoming for § 1292(b) purposes is that *Dura* did not, even by way of *dicta*, express the opinion Flowserve now claims is the subject of substantial disagreement. As mentioned, the *Dura* court expressly declined to formulate precise standards for proving loss causation despite a request to do so by the Defendant and the Solicitor General. Evan R. Chesler & J. Stephen Beke, *Loss Causation Post–Dura*, 1517 P.L.I. Corp. Law & Prac. Course, Handbook Series 1277, 1280 (2005) (citing Transcript of Oral Argument at 3–9, 11, 18–20, *Dura*, 544 U.S. at 346, 125 S.Ct. 1627 (No. 932)). Outside of rejecting the inflated purchase price approach, *Dura's* instructions on loss causation pleadings were limited to: reaffirming the applicability of Rule 8(a)(2)'s short and plain statement rule to such pleadings; requiring that plaintiffs plead loss causation in a way that provides the defendant "'fair notice'" of their claims and the grounds underlying them; and suggesting that plaintiffs include allegations that the stock price "fell significantly after the truth became known." *Id.* at 1282 (citing *Dura*, 544 U.S. at 346–47, 125 S.Ct. 1627).

The *Dura* court did not endorse or address Flowserve's proposed "fact-for-fact"

method of pleading loss causation. *Id.* (citing *Dura*, 544 U.S. at 346, 125 S.Ct. 1627) (The *Dura* court did not purport to address whether loss causation allegations must "explicitly allege that the subject matter of the alleged misrepresentations ... was revealed to the market by way of some 'corrective disclosure' that preceded the drop in the price of the stock (or the economic loss generally)."). "While the Court suggested that the plaintiffs needed to have alleged in some fashion that 'the truth [regarding the ... misrepresented information] became known' before the "'share price fell'.", the Court did not set forth guidelines as to whether such a revelation ... must be direct [or] inferential." *Id.* (citing *Dura*, 544 U.S. at 347, 125 S.Ct. 1627). In actuality, *Dura* "left the lower federal courts free to continue to develop somewhat diverse approaches to the pleading of corrective disclosures preceding economic losses." *Id.*

Thus the "opinion" on which Flowserve seeks Fifth Circuit guidance and over which it contends there is substantial disagreement is not reasonably drawn from the *Dura* case. Nor does any Fifth Circuit case suggest the interpretation of *Dura* urged by Flowserve. In fact, as pointed out by Plaintiffs, none of the cases relied upon by Flowserve are apposite to its position on *Dura*.[3] Cases and commentary following *Dura* and directly addressing the pleading issue substantiate that it did not effect a material change or foretell a shift in loss causation pleading require-

3. Flowserve cites *In re Odyssey*, 424 F.Supp.2d 880 (N.D.Tex.2005), in support of its loss causation pleading theory. (Notice of Supp. Auth. at 1) But *In re Odyssey* is distinguishable on several fronts. First, although the district court in *Odyssey* observed that the parties disagreed over "the scope of what *Dura* now requires a plaintiff to plead", the court did not endorse or even reference the type of fact-for-fact pleading method touted by Flowserve in this case. *Odyssey*, 424 F.Supp.2d at 886. Second, the "false financial statements" claim in *Odyssey* (the only claim similar to those in this case) was rejected-not on loss causation pleading grounds-but under the PSLRA's safe harbor provision. *Id.* at 886–87. Finally, the language from *Odyssey* heavily relied upon by Flowserve as supporting its theory of loss causation pleading is pulled from a portion of the opinion addressing the resignation of the company's CEO-a claim utterly unlike any in this case. *Id.* at 887.

ments other than in the narrow area of inflated purchase price pleadings. *See* Patrick J. Coughlin, Eric Alan Isaacson and Joseph D. Daley, *What's Brewing in Dura v. Broudo? The Plaintiffs' Attorneys Review the Supreme Court's Opinion and Its Import for Securities Fraud Litigation,* 37 Loy. U. Chi. L.J. 1, 17 (2005) ("Clearly the [*Dura*] Court means for ... [pleading loss causation] to be a fairly simple [exercise]....").

In its *In re Bradley Pharmaceuticals, Inc., Securities Litigation* opinion, a district court in New Jersey squarely took on the issue of whether the method of pleading urged here by Flowserve was required post-*Dura.* 421 F.Supp.2d 822 (D.N.J. 2006). The defendants in that case argued that *"Dura* requires Plaintiffs to 'allege a loss' following the 'corrective disclosure' of the allegedly undisclosed misrepresentation.' " *Id.* at 828. They complained that the plaintiffs had not adequately pleaded loss causation because the alleged corrective disclosure (an SEC inquiry) did not address the subject of the alleged misrepresentation (false statements in connection with the "sham" sale of a cold remedy). The district court rejected the defendants' argument with the following:

> We disagree with Defendants' rigid and dogmatic interpretation of *Dura.* In *Dura,* the Supreme Court only suggested that the plaintiffs needed to have alleged in some fashion that 'the truth became known' before 'the share price fell.' However, *Dura* did not address what type of events or disclosures may reveal the truth. Nor did *Dura* explain how specific such disclosures must be. *See In re Winstar Communications,* 2006 WL 473885 (S.D.N.Y. 2006) (stating that in *Dura,* "[t]he Court did not address the means by which the information is imparted to the public. Specifically, *Dura* did not set forth any requirements as to who may serve as the source of the infor-

mation, nor is there any requirement that the disclosure take a particular form or be of a particular quality.") ... *see finally In re Worldcom, Inc. Sec. Litig.,* 2005 WL 2319118, at *23 (S.D.N.Y. Sept.21, 2005) (to satisfy loss causation under *Dura,* plaintiff must "establish that his losses were attributable to some form of revelation to the market of the wrongfully concealed information").... Guided by a pragmatic understanding of *Dura,* the Court concludes that Plaintiffs have adequately pled loss causation. The revelation of the "truth" about the [cold remedy sale] did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events. *See, e.g., Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.,* 2005 WL 1563206 (N.D.Ill.2005)....

421 F.Supp.2d at 828–29 (some internal citation omitted).

In *In re Enron Corp. Securities, Derivative and Erisa Litig*ation, the district court, in a lengthy analysis of *Dura's* effect on loss causation pleading, recognized that *Dura* did "not impose heightened or onerous pleading requirements." *In re Enron Corp. Secs., Derivative and Erisa Litig.,* No. MDL–1446, 2005 WL 3504860 at * 15–19 (S.D.Tex. Dec.22, 2005); *see also In re Daou Sys.,* 411 F.3d 1006, 1026 (9th Cir. 2005) (another post-*Dura* opinion upholding loss causation pleadings—which alleged a sharp drop in stock price on the heels of a public revelation of the company's "true financial situation"—as sufficiently alleging pursuant to *Dura* "some indication that the drop in ... stock price was causally related to Daou's financial misstatements"); *Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.,* No. 04–C–1107, 2005 WL 1563206 * 5 (N.D.Ill. June 30, 2005) (where, post-*Dura,* the district court let stand a pre-*Dura* ruling denying a motion

to dismiss on loss causation grounds—finding allegations of defendants' numerous false statements about the *financial condition* of the company which were later revealed through partial disclosures relating to the fraud causing the stock price to drop sufficient to allege loss causation) (emphasis added).

To sum up, since *Dura*, the circuits have continued to vary in their approaches to loss causation pleading-some with stricter requirements than others. But neither *Dura* nor any Fifth Circuit case requires the type of "fact-for-fact" method of loss causation pleading urged by Flowserve. Because there is no *opinion* expressly requiring or even reasonably suggesting Flowserve's proposed pleading approach, there is necessarily no substantial disagreement to support an interlocutory appeal. The circuits' disparate pleading requirements for loss causation do not amount to a substantial disagreement over whether fact-for-fact pleading should be required. Given the *Dura* Court's expressed allegiance to a "simple test" for loss causation pleadings under Rule 8(a)(2), Flowserve's position favoring fact-for-fact precision in pleading is even less tenable. Finally, as pointed out by Plaintiffs, to impose a requirement in securities fraud cases that each fact misrepresented be in turn specifically confessed before liability could attach would discourage candor and inhibit the flow of precise, accurate information between corporations and shareholders.

Because Flowserve's § 1292(b) motion with respect to loss causation fails on the "substantial disagreement" prong, the Court denies this part of the motion on that ground and will not address the other § 1292(b) factors.

**B. Negative Causation Defense**

Flowserve next moves to certify the following question regarding the statutory negative causation defense:

> Whether, in a case predicated on the fraud-on-the market theory, a plaintiff's claims under Section 11 are barred by the statutory negative causation defense where the alleged curative disclosure that the plaintiff claims resulted in his losses did not reveal the facts allegedly misrepresented in the challenged registration statements.

This point merits no discussion because it mirrors the argument supporting the loss causation pleading issue above. In other words, to certify the negative causation question, the Court must accept Flowserve's premise that *Dura* requires fact-for-fact loss causation pleading. Thus for the same reasons set forth in the foregoing section, the Court rejects the negative causation argument and denies this portion of Flowserve's motion to certify.

**C. Safe Harbor** [4]

■ Flowserve's third controlling question relates to the PSLRA's "safe harbor" provision:

> (A) the forward-looking statement is—
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> (ii) immaterial; or
> (B) the plaintiff fails to prove that the forward-looking statement—

---

**4.** (c) Safe Harbor.—
(1) In general.—Except as provided in subsection (b), in any private action arising under this title that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

Whether the PSLRA safe harbor for forward-looking statements protects from liability projections accompanied by meaningful cautionary language independent of the speaker's alleged state of mind.

Reduced to its essence, Flowserve's argument boils down to a claim that the Court made a mistake in applying the PSLRA's safe harbor provision and in the process made an incorrect statement of law regarding the interplay between the two prongs of the provision. More precisely, Flowserve maintains that, in denying the Defendants' motions to dismiss, the Court conflated the two independent prongs of the PSLRA's safe harbor provision and incorrectly stated that Plaintiffs can defeat either prong by pleading that a defendant had actual knowledge of a statement's falsity. Citing the text of the safe harbor statute, its legislative history and a plethora of cases, Flowserve challenges the Court's suggestion of a "settled principle" that actual knowledge of falsity defeats

> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
> (ii) if made by a business entity; was—
> (I) made by or with the approval of an executive officer of that entity, and
> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.
> 15 U.S.C. § 78u–5(c)(1)(A) and (B).

**5.** See Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 88 Harv. L.Rev. 607 at 623.

**6.** Although the Court's sole task here is to decide Flowserve's motion for interlocutory appeal under § 1292(b)'s standards, it is important to clarify the effect of the Court's incorrect perception of the law on Flowserve's motion to dismiss. Specifically, despite the Court's inaccurate assessment of the effect of a defendant's state of mind on the operation of the first prong of the safe harbor provision, it need not as a consequence reverse that portion of its ruling on the motion

either prong of the provision. (Mot. at 15–20)

The Court agrees with Flowserve on this point. Nonetheless, that does not qualify the question for a § 1292(b) appeal. To elevate the Court's misstatement into an issue appropriate for interlocutory appeal Flowserve must demonstrate that it meets § 1292(b)'s standards as a controlling question of law over which there is substantial ground for difference of opinion and that an immediate appeal from the order may speed up the litigation. And the fact that this Court made a statement that conflicts with the weight of authority on the safe harbor provision does not a substantial disagreement make. Although, as mentioned, "[d]egrees of legal doubt escape precise quantification,"[5] Flowserve is hard pressed here to quantify the conflict between this Court's incorrect assessment of the law and the extensive authority to the contrary as "substantial." Thus, this issue is not a proper one for an interlocutory appeal and Flowserve's motion must be denied on this point as well.[6]

to dismiss. More to the point, to qualify for safe harbor protection under the first prong, the statements at issue must be accompanied by "meaningful cautionary language." The Court has reviewed those portions of the pleadings that Flowserve contends are protected under the first prong of the safe harbor provision and determined that it is impossible without more information (via summary judgment) to tell whether the cautionary language describes the "principal or important risks" facing Flowserve at the time they were made. See *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 733 (7th Cir.2004); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 599 (7th Cir.2006) (quoting *Asher*, 377 F.3d at 733); and Marc H. Folladori, *Protecting Forward–Looking Statements: The Private Securities Litigation Reform Act of 1995 and Other Safeguards*, 1522 P.L.I. Corp. Law & Prac. Course, Handbook Series 297, 334 (January 2006). This, in turn, means that the Court cannot presently determine if the accompanying cautionary language is "meaningful" thus dismissal under the safe harbor provision is precluded at this time.

## IV.

## CONCLUSION

For all of the foregoing reasons, the Defendants' Motion to Certify November 22, 2005 Order for § 1292(b) Interlocutory Appeal (doc. 141) is DENIED.

**SO ORDERED.**